Denise LAUDERBAUGH, a single woman; Larry's Homes of Pennsylvania, Inc., a Pennsylvania Corporation

v.

HOPEWELL TOWNSHIP, Beaver County, Pennsylvania, a first class Township organized and existing under the laws of Pennsylvania; John M. Bates, individually, and in his capacity as Hopewell Township Zoning Officer; Patricia L. Yannessa–Bates, individually, and in her capacity as Manager of Hopewell Township; Patsy D'Eramo, individually, and in his capacity as a member of the Hopewell Township Board of Commissioners; Steve Rodich, individually, and in his capacity as a member of the Hopewell Township Board of Commissioners; Ted Pajak, individually, and in his capacity as a member of the Hopewell Township Board of Commissioners; Mario Leone, Jr., individually, and in his capacity as a member of the Hopewell Township Board of Commissioners; Tim Force, individually, and in his capacity as a member of the Hopewell Township Board of Commissioners

Hopewell Township, John M. Bates, Patricia L. Yannessa–Bates, Patsy D'Eramo, Steve Rodich, Ted Pajak, Mario Leone, Jr., and Tim Force, Appellants

No. 01–4048.

United States Court of Appeals, Third Circuit.

Filed Feb. 11, 2003.

Argued May 1, 2002.

Pamela Beck Danner, (Argued), Paula Brodeur Haefner, Danner & Associates, McLean, for Appellees.

Eric P. Reif, (Argued), Jeanette H. Ho, Pietragallo, Bosick & Gordon, Pittsburgh, for Appellants.

Before ROTH, NYGAARD and WEIS, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

Denise Lauderbaugh wants to install her manufactured mobile home, which complies with standards established by the Department of Housing and Urban Development (HUD), in the "R–2" residential district in the town of Hopewell. The HUD standards were created by the National Manufactured Housing Construction and Safety Standards Act (NMHCSSA), 42 U.S.C. §§ 5401–5426, an act that prohibits municipalities from imposing construction and safety standards on manufactured homes that differ from the federal standards.[1] Hopewell has prohibited Lauder-

---

1. NMHSSCA was enacted by Congress as a consumer protection measure. *See, e.g., Scur-*

baugh from installing her HUD home on her lot because the Hopewell zoning ordinance does not allow mobile homes in the R–2 district. Hopewell interprets its ordinance to exclude a mobile home from the R–2 district whether or not it complies with the NMHCSSA. Hopewell also interprets its ordinance to permit in the R–2 district manufactured modular homes, which comply with the BOCA/CABO Codes. We must determine if Hopewell's treatment of HUD compliant mobile homes is preempted by NMHCSSA. For the reasons stated below, we conclude that it is not clear whether Hopewell has excluded HUD homes from the R–2 district on the basis of safety and construction standards or if the exclusion is based on aesthetics and impact on property values. We will, for that reason, reverse the District Court's grant of summary judgment and remand this case for further proceedings.

## I. Facts

In May of 1998, Denise Lauderbaugh prepared to purchase a home. She examined manufactured mobile homes sold by Larry's Homes of Pennsylvania, Inc., and selected a multi-section manufactured home which would be placed on a permanent foundation with wheels and axles removed. The home Lauderbaugh selected was a HUD home, complying with the NMHCSSA. Lauderbaugh also looked at property in Hopewell Township and discussed acquiring building permits with Hopewell's zoning officer, John Bates.

Bates informed Lauderbaugh that the property she was considering was zoned "R–2" and that mobile homes were not permitted in the R–2 district. In a December 1998 letter, Bates explained that to qualify for the R–2 district, a home must be a "BOCA/CABO" home; that is, it must meet the following building codes: the 1993 BOCA building Code, the 1992 CABO One and Two Family Dwelling Code, the 1993 BOCA National Plumbing Code, and the 1993 BOCA National Fire Prevention Code. He also explained that "HUD Homes" were considered "mobile homes" and could not be located in the R–2 district, but only in the R–1 district. Bates claims that Lauderbaugh then told him that she planned to install, not a mobile home, but a BOCA/CABO compliant manufactured modular home.[2] Hopewell interprets its zoning ordinance to permit BOCA/CABO compliant modular homes in the R–2 district.

The Hopewell zoning ordinance allows "mobile homes" in the R–1 district, but not in any other residential district. The ordinance defines mobile homes in S 310(60) as:

A transportable, single-family dwelling intended for permanent occupancy, office or place of assembly contained in one unit or in two units designed to be jointed into one integral unit capable of again being separated for repeated towing which arrives at a site complete except for minor and incidental unpacking and assembly operations, and construct-

---

lock v. City of Lynn Haven, 858 F.2d 1521, 1524 (11th Cir.1988). The original language of the act provided that its purposes were "to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes." 42 U.S.C. § 5401 (1981).

2. A "modular" home is built off-site in modular components that are transported to a residential site and erected on a permanent foundation. Unlike a "mobile" home, a "modular" home is not built on a permanent chassis. See Texas Manufactured Housing Assn., Inc. v. City of Nederland, 101 F.3d 1095, 1098–99 (5th Cir.1996).

ed so that it may be used without a permanent foundation.

After her contact with Bates, Lauderbaugh arranged to purchase the HUD home. She contracted to buy a parcel of land in an R–2 district in Hopewell and to have the site prepared with a permanent foundation and a basement. She also applied for a building permit. The permit was issued, identifying the structure to be built as a "mason/frame" building proposed to be used as a single-family home. Hopewell claims that Lauderbaugh obtained her permit by misrepresentation because she had stated that she planned to place a modular home, not a mobile home, on the property. Bates contends that Lauderbaugh told him she needed the permit immediately to go to closing on the land and that she would deliver the plans for the modular home when she picked up the permit. Bates was not present when Lauderbaugh came in for the permit, and she did not deliver plans for a modular home. Lauderbaugh, on the other hand, contends that she was told by Larry's Homes that the Chief of the Pennsylvania Manufactured Housing Division had said that "the [Hopewell] ordinance did not preclude the siting of a HUD–Code home in either Zoning District R–2 or anywhere else in Hopewell Township."

On June 2 and 15, 1999, the two halves of Lauderbaugh's home were delivered to the lot. When Bates saw that she was attempting to locate a HUD home in the R–2 district, he verbally revoked her building permit and forbade the placing of the home on the foundations. He formally revoked her permit in a letter, dated July 2, stating that the permit was revoked because the home was built to the HUD Code rather than in compliance with BOCA/CABO. Soon thereafter, Lauderbaugh hired legal counsel and began to dispute the revocation of the building permit.

Lauderbaugh first filed an appeal from the formal revocation of her building permit with the Hopewell Township Zoning Hearing Board on July 19. The Zoning Hearing Board began a hearing on August 12 but continued it indefinitely for reasons that are not clear. The day after the hearing began and, despite the fact that the appeal was still pending before the Zoning Hearing Board, Bates sent a letter to Lauderbaugh demanding that she immediately remove her home because it posed a danger to the safety of neighborhood children and it was partially located on the public right of way.[3] Several days later, Lauderbaugh filed an appeal from that letter with the Zoning Hearing Board. On August 17, despite the pending appeals, Bates sent Lauderbaugh's attorney another letter demanding that Lauderbaugh remove her home. This letter recognized that Lauderbaugh was appealing to the Zoning Hearing Board but nevertheless threatened to institute state court litigation to remove the home and to assess any costs against Lauderbaugh. On August 18, the Chief of the Pennsylvania Manufactured Housing Division sent a letter to the President of the Hopewell Board of Commissioners, informing him that Hopewell could not preclude Lauderbaugh from siting a HUD home in the R–2 district. Hopewell's solicitor responded that Hopewell's position remained unchanged.

To explain the basis for the exclusion of mobile homes from R–2 districts, during the preliminary proceedings in this case, Hopewell presented affidavits from Ray

---

**3.** Lauderbaugh denies that either section of the home intruded into the public right of way.

Antonelli and Michael Kohlman. Ray Antonelli acted as a consultant in drafting Hopewell's zoning ordinance. Antonelli stated in his affidavit that the restriction of mobile homes to the R–1 zoning district was based on three factors: (1) "mobile homes" have a lower purchase price than other types of housing and depreciate over time, eroding the Township tax base; (2) the R–1 zoning district has different lot and area requirements, reducing the density of number of "mobile homes" in the Township; and (3) "mobile homes" are "not always aesthetically comparable" to other types of housing including modular housing. Michael Kohlman was chief county assessor. Kohlman stated in his affidavit that mobile homes depreciate in value each year and, unlike other types of single family dwellings, have a unique ability to reduce the tax base in a municipality.

## II. Procedural History

On August 20, 1999, Lauderbaugh and Larry's Homes of Pennsylvania, Inc., filed a complaint in the United States District Court for the Western District of Pennsylvania. The complaint alleged that Hopewell Township had violated Lauderbaugh's Fifth Amendment rights, her rights to due process and equal protection of the law, the NMHCSSA, and Pennsylvania state law. The plaintiffs also moved before the Zoning Hearing Board to continue indefinitely Lauderbaugh's appeals pending the resolution of this lawsuit.

Hopewell moved to dismiss the complaint because the action was not ripe for adjudication. The District Court denied that motion. After further proceedings, the District Court denied plaintiffs' motions for summary judgment on their procedural and substantive due process, equal protection, Fifth Amendment Takings Clause, and state law claims. The court did not grant summary judgment on the substantive due process and equal protection claims because it found that material issues of fact existed as to whether aesthetic qualities of mobile homes and their effect on property values had led to the revocation of Lauderbaugh's building permit. The District Court then did grant summary judgment in favor of Lauderbaugh and Larry's Homes of Pennsylvania, Inc., with respect to their claims under the NMHCSSA, finding that Lauderbaugh's "manufactured" home was excluded from the R–2 district based solely on the fact that it was built to NMHCSSA standards and not to BOCA/CABO standards. As a result, the District Court ordered Hopewell to allow Lauderbaugh to install her mobile home on her property. Hopewell appealed.

## III. Jurisdiction and Standard of Review

Our jurisdiction over this case is in dispute. The District Court exercised subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the claims arose under the Constitution and laws of the United States and were part of the same case or controversy. However, as discussed below, the parties dispute whether these claims were ripe for adjudication by the District Court. We have jurisdiction to review a final order of the District Court under 18 U.S.C. § 1292.

■ We exercise plenary review over both the District Court's ripeness determination, *see Presbytery of New Jersey v. Florio*, 40 F.3d 1454, 1462 (3d Cir.1994), and its summary judgment ruling, *see Health Maintenance Org. of New Jersey v. Whitman*, 72 F.3d 1123, 1127 (3d Cir. 1995).

## IV. Discussion

### A. Ripeness

Hopewell first challenges the District Court's ruling on the grounds that this

case was not ripe for adjudication. The District Court found that the case was ripe because Hopewell has treated its zoning decision as finally resolved. We agree with the District Court that Hopewell cannot prevent Lauderbaugh from installing her home, threaten state court litigation to force its removal, and, at the same time, claim there is no controversy ripe for adjudication.

■ Lauderbaugh's first contention is that we should ignore Hopewell's ripeness argument. She points out that Hopewell's Notice of Appeal does not refer to the orders of the District Court that addressed the ripeness issue. As a result, she argues, Federal Rule of Appellate Procedure 3(c) denies us jurisdiction to consider ripeness. Her argument is clearly misplaced. In *Acierno v. Mitchell,* 6 F.3d 970 (3d Cir.1993), we rejected an identical argument. *See id.* at 974 ("Although we generally decline to address arguments for the first time on appeal, 'ripeness affects [the] justiciability' of plaintiffs claims, and we will address it here."). *See also Felmeister v. Office of Attorney Ethics,* 856 F.2d 529, 535 (3d Cir.1988) ("This Court has recognized that considerations of ripeness are sufficiently important that we are required to raise the issue sua sponte even though the parties do not.").

■ We turn, therefore, to Hopewell's argument. It is well established that, in § 1983 cases involving land-use decisions, a property owner does not have a ripe claim until the zoning authorities have had "an opportunity to 'arrive[ ] at a final, definitive position regarding how [they] will apply the regulations at issue to the particular land in question.'" *Taylor Investment, Ltd., v. Upper Darby Township,* 983 F.2d at 1291 (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 191, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)).

We have consistently applied this finality rule to bar constitutional claims by property owners or tenants who have challenged the denial of a permit by an initial decision-maker but failed to take advantage of available, subsequent procedures. *See, e.g., Sameric Corp. v. Philadelphia,* 142 F.3d 582, 597–598 (3d Cir.1998) (finding a substantive due process claim premature when the plaintiff failed to complete the denial of a building permit); *Acierno v. Mitchell,* 6 F.3d at 974–75 (finding unripe a constitutional challenge to the denial of a building permit because the plaintiff did not appeal the denial or seek a variance); *Taylor,* 983 F.2d at 1289 (dismissing as unripe a constitutional challenge to the revocation of a use permit where the tenant did not reapply, appeal or seek a variance); *Midnight Sessions,* 945 F.2d at 686 (holding that a plaintiff's claim was not ripe where it did not appeal the denial of a certificate of occupancy to the review board).

Hopewell urges us to dismiss Lauderbaugh's claim as premature. It argues that this case is like *Sameric, Acierno,* and *Taylor* because the Zoning Hearing Board's decision to deny Lauderbaugh's building permit is reviewable *de novo* by the Zoning Hearing Board, which has yet to make a final decision. *See Sameric,* 142 F.3d at 598, *Acierno,* 6 F.3d at 976; *Taylor,* 983 F.2d at 1292–93.

Hopewell's argument ignores, however, that Lauderbaugh attempted to avail herself of the appeals process. She appealed the formal revocation of her building permit to the Hopewell Township Zoning Hearing Board on July 19, 1999. She also appealed the August 13th letter from Hopewell that demanded that she immediately remove her home because it was a safety hazard. She filed this lawsuit only after the Zoning Hearing Board had indefinitely continued her appeals and Hopewell

had informed her that, despite those pending appeals, it would institute state court litigation to remove her home and assess any costs against her.

Thus, this is not a case, like *Sameric*, *Acierno*, and *Taylor*, where a plaintiff's failure to take advantage of available, subsequent procedures foreclosed any chance that those procedures could resolve the controversy and obviate the need to address the constitutional issues. Instead, Hopewell's decision to ignore the appeals and enforce its zoning decision by forcing Lauderbaugh to pay to move her home has created a justiciable controversy.

■ Hopewell cannot treat its zoning decision as final enough to force a significant hardship upon Lauderbaugh by forcing her to pay to move her home but not final enough to be ripe for adjudication. The ripeness doctrine prevents judicial interference "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs., Inc. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The finality rule is designed to enforce this requirement, not to require the exhaustion of administrative remedies. *See Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 192, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ("the question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable."). Thus, the finality rule allows a suit whenever a "decision maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Id.* Hopewell's threat to institute state court litigation to remove Lauderbaugh's home and tax any costs against her is clearly a definitive position that threatens a concrete injury. This case is therefore ripe for adjudication.

Hopewell agues that this analysis is incorrect, claiming that it is not treating its zoning decision as finally decided. Despite its threats of litigation, Hopewell contends that it ordered Lauderbaugh to remove her home for safety reasons, not because it considered its zoning decisions final. But, it was Hopewell's own stop work order that created the danger by preventing Lauderbaugh from installing her home, and that stop work order was predicated on Hopewell's finding that Lauderbaugh's home could not be installed in the R–2 district. Thus, although Hopewell has not denied the Zoning Hearing Board's authority to oversee all zoning decisions, it is treating its own zoning decision as final enough to inflict a concrete injury on Lauderbaugh. As a result, we will affirm the District Court's ruling that this case is ripe for adjudication.

## B. Preemption

■ The substantive issue in this case is whether the District Court properly held that the NMHCSSA preempted Hopewell's zoning ordinance. The District Court granted summary judgment in favor of plaintiffs because it found, as a matter of law, that Hopewell used safety and construction codes that conflict with the NMHCSSA to exclude from the R–2 district some manufactured homes, *i.e.*, HUD homes which comply with the NMHCSSA, but not other manufactured homes which comply with BOCA/CABO. We must determine whether Hopewell is excluding HUD homes from its R–2 district solely because HUD homes fail to meet the BOCA/CABO safety and construction standards, as opposed to the NMHCSSA safety and construction standards, or because HUD homes fail to meet some other, permissible, zoning criteria.

■ The NMHCSSA was enacted to protect consumers by reducing accidents,

lowering insurance costs, and improving the quality and durability of manufactured homes. *See Scurlock v. City of Lynn Haven, Florida,* 858 F.2d 1521, 1524 (11th Cir.1988). The NMHCSSA states its purpose as the protection of quality, durability, safety, and affordability of manufactured homes by providing for performance based construction standards and cost-effective construction techniques. *See* 42 U.S.C. § 5401(b). In other words, the act's aim is to set standards for how manufactured homes will be built; it does not attempt to determine where they will be located.

In order to achieve the consumer protection goal of providing for minimum construction and safety standards in the construction of manufactured homes, the NMHCSSA explicitly preempts state and local safety and consumer protection regulations regarding manufactured homes. The act provides:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). *See also,* 24 C.F.R. § 3282.11(a) (Manufactured Homes Procedural and Enforcement Regulations that effectuate § 5043(d)). Thus, the NMHCSSA prohibits localities from imposing any safety and construction standard upon manufactured homes that differs from the federal standard.

■ The preemptive effect of NMHCSSA extends to safety and construction standards used to define zoning regulations. Thus, although localities may legitimately regulate land use to advance a myriad of different interests, including property values, aesthetics, health, and the general welfare, *see Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 128, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) and cases cited therein, they may not use safety and construction standards that conflict with the NMHCSSA as a regulatory tool. *See Scurlock v. City of Lynn Haven,* 858 F.2d 1521, 1525 (11th Cir.1988).

The distinction between safety and construction standards and zoning regulations intended to promote aesthetic and property value standards may not be immediately evident from the language of a zoning ordinance. For example, in *Georgia Manufactured Housing Assn., Inc. v. Spalding County,* 148 F.3d 1304 (11th Cir.1998), a zoning regulation required that a manufactured home be built with a 4:12 roof pitch in order to be placed in most residential districts. The District Court held that the regulation was preempted by NMHCSSA because it was a construction or safety requirement. The Eleventh Circuit Court of Appeals reversed, holding that the regulation was not preempted. The court distinguished the Spalding County regulation from the Lynn Haven regulation that that court had previously found to be preempted in *Scurlock* because the Spalding County regulation could have been based on aesthetics, rather than being a construction or safety standard protecting consumers from "various potential hazards associated with manufactured housing." *Id.* at 1310. The court determined that because the regulation established an aesthetic standard and did "not have any purported basis in consumer protection," it was not preempted by NMHCSSA. *See also Texas Manufactured Housing Assn. v. City of Nederland,* 101 F.3d 1095, 1100 (5th Cir.

1996) (holding that ordinance that excluded "trailer coaches" from the city except in "authorized trailer parks" was for the purpose of protecting property values and did "not expressly link its provisions in any way to local safety and construction standards.").

The language of the Hopewell Zoning Ordinance 95–2 does not refer to NMHCSSA or to any other construction or safety standards for manufactured homes. Section 600 of the ordinance sets out the permitted uses for the R–1 Residential–Agricultural District, which include "single family dwelling unit," "mobile homes on individual lots" (with certain provisos not relevant to the case before us), "municipal recreation facilities," "educational and religious uses," "municipal facilities," and "agriculture, horticulture and/or silviculture." Section 700 describes the permitted uses for the R–2 Residential–Low District as "single-family dwelling units," "municipal recreation facilities," "educational and religious uses," and "municipal facilities." Hopewell Township interprets "single-family dwelling units" as permitted in the R–2 district to be those that comply with BOCA/CABO. This definition, as it applies to manufactured homes, includes modular homes but not mobile homes. We must determine whether the basis for that distinction is a safety and construction standard or a desire to promote aesthetics and to protect property values in the R–2 district.

The District Court considered this distinction in ruling on plaintiffs' motions for summary judgment. In connection with plaintiffs' substantive due process and equal protection claims, the District Court found genuine issues of material fact. In reviewing the substantive due process claim, the court determined that, despite Lauderbaugh's contention that the revocation of her building permit was an irration-

al application of the zoning ordinance, a jury must determine whether HUD homes are aesthetically similar to modular homes and whether HUD homes have an adverse effect on the tax base or on property values. The court noted that, based on the evidence before it, including the Antonelli and Kohlman affidavits, "a reasonable fact finder could reach either conclusion." The court found the same material question regarding aesthetic and property value issues existed with regard to the equal protection claim.

The court then found as a matter of law that, because Lauderbaugh's "manufactured" home was excluded from the R–2 district based solely on the fact that it was built to NMHSSCA standards and not to BOCA/CABO standards, the ordinance contravened the express preemption provision of the NMHSSCA. In making its preemption analysis, the District Court found that there was no genuine issue of material fact as to the reason that Hopewell refused to allow Lauderbaugh's home in the R–2 district. The court reasoned that even if the ordinance was enacted to protect aesthetics and property values, no mention of these concerns was made in the decision to exclude Lauderbaugh's manufactured home from the R–2 district.

■■■ This ruling by the District Court implies that, despite the fact that aesthetics and property value considerations might lie behind the enactment and overall interpretation of the Hopewell zoning ordinance, these factors cannot be considered relevant to the revocation of Lauderbaugh's building permit unless specifically mentioned as such. We do not accept this distinction. If in fact the zoning ordinance was established and has been interpreted to protect aesthetics and property values, we see no need for its enforcers to proclaim that a decision is based on aesthetics and property values each time the ordi-

nance is invoked. It is the underlying purposes of a zoning ordinance that are determinative of its susceptibility to preemption by the NMHCSSA. *See Georgia Manufactured Housing Assn.*, 148 F.3d at 1310 (holding that "a zoning requirement [as to roof pitch] related to aesthetics is not preempted [by NMHCSSA] because the *goals and effects* of such a standard have nothing to do with consumer protection . . . ." (emphasis added)).

■ On remand, the District Court must determine whether Hopewell's ordinance, insofar as it pertains to mobile homes, was enacted solely to establish safety and construction standards of whether there was an underlying purpose to protect aesthetics and property values in certain residential districts. The NMHCSSA preempts only safety and construction standards. It is focused on consumer protection, *see* 42 U.S.C. § 5401, and does not strip a township of its authority to make land use decisions regarding, for example, aesthetics or property values. Thus, although the NMHCSSA prevents localities from using safety standards to exclude manufactured homes from a zoning district, it does not stop them from excluding certain types of manufactured housing from a zoning district using some other, permissible, criteria—even if, by using that permissible criteria, the locality bans most, or even every, manufactured home.

■ Moreover, if a township has decided that certain types of manufactured homes—which it has defined as "mobile homes"—are aesthetically unpleasing, or harmful to local property values, but that other types of manufactured homes—which it has interpreted to be "modular homes"—are not, the township may bar "mobile homes" from a zoning district and allow "modular homes." It may do so

even if a "mobile home" is built in compliance with NMHCSSA standards. *See Scurlock v. City of Lynn Haven*, 858 F.2d at 1525 (stating that a municipality could "undoubtedly" prohibit mobile homes from a residential district).

Because we are reviewing the grant of a summary judgment motion, we must view all the facts in the light most favorable to the non-moving party, in this case, Hopewell Township. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). In that light, we accept the statements of Ray Antonelli and Michael Kohlman that the restriction of mobile homes to the R–1 district was for aesthetic and property value considerations. On remand, the finder of fact will have to determine whether the exclusion of NMHCSSA compliant mobile homes, but not of BOCA/CABO compliant modular homes, from the R–2 district was based solely on safety and construction standards or was based, at least in part, on property value and aesthetic considerations.

## V. Conclusion

For the above stated reasons, we will reverse the judgment of the District Court and remand this case for further proceedings consistent with this opinion.

NYGAARD, Circuit Judge, dissenting.

I believe that the District Court's thorough analysis, and conclusion with respect to the preemption issue, are entirely correct. Indeed, I can add to Judge Diamond's opinion only the following references and observations. The Township's zoning ordinance expressly permits the placement of mobile homes only in its R–1 (residential-agricultural) district, and placing them in other districts is excluded by

implication.[1] The purported basis for this restriction is to preserve the aesthetics, property value and tax base of the Township, a legitimate governmental interest. The District Court observed in its opinion that "the Township could have thought that an ordinance prohibiting *traditional* mobile homes from certain zoning districts was a rational way to achieve" these interests (citing Affidavits of Ray Antonelli, zoning ordinance consultant, and Michael Kohlman, chief county assessor).[2]

The preemption problem arises from the manner in which the Township's ordinance *has been applied* in this case, rather than its underlying purpose. I can agree that on its face, the ordinance does not distinguish between manufactured and modular homes, but only between "mobile homes" as defined in the statute and other types of single-family dwelling units. There is, however, no doubt from this record that the ordinance has been (albeit inconsistently) interpreted by the Township to preclude the permanent siting of factory-built mobile or "manufactured" homes built to the HUD Code, but to allow the placement of factory-built "modular" homes built to the BOCA/CABO Codes, in the R–2 district. The evidence establishes that Bates was enforcing the ordinance against Appellee based on the fact that her home is a HUD Code, rather than a BOCA/CABO Code home. Indeed, even on appeal, Appellants continue to distinguish between excluded mobile, or "manufactured", homes and permitted factory-built, or "modular" homes on the basis of Code compliance. *See* Brief on Behalf of Appellants at 27–28 (discussing how mobile homes are built in conformity with HUD standards, unlike modular homes that are constructed in accordance with CABO standards). This distinction by Code is improper.

The NMHCSSA preemption statute provides, in pertinent part:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). In addition, HUD's guidelines on preemption specifically provide that "a locality is free to adopt and enforce ordinances that regulate the appearance and dimensions of homes so long as the criteria . . . do not have the effect of

---

1. The ordinance defines a "mobile home" as a "transportable, single-family dwelling . . . contained in one unit or in two units designated to be jointed into one integral unit . . . which arrives at a site complete and ready for occupancy except for minor and incidental unpacking and assembly operations, and constructed so that it may be used without a permanent foundation."

   The record is undeveloped as to whether transportability *is* a workable *distinction* between mobile and modular homes. Of course, the burden was on Defendants to come forward with evidence to create a triable issue as to that distinction, or some other non-Code based distinction, being the actual basis for permit denial. Nowhere in Defendants' brief do they mention the transportability distinction; rather they consistently distinguish permitted and excluded housing on the basis of code compliance.

2. The District Court concluded that conflicting evidence regarding the aesthetic similarity of Plaintiff's home to others in the neighborhood, and the effect of HUD Code homes on property values and the tax base, raised genuine issues of material fact as to Plaintiff's substantive due process claim, to be resolved at trial.

excluding manufactured homes based on the construction and safety standards to which they were built." 62 Fed.Reg. 3456, 3457 (1997). Moreover, "if a locality . . . is attempting to regulate, and even exclude, certain manufactured homes through zoning *enforcement* that is based solely on a construction and safety code different from that prescribed by the Act, the locality lacks such authority." *Id.* (emphasis added). Thus, the statute forbids the Township from *applying* zoning ordinances on the basis of any construction or safety code requirement that differs from the HUD Code. By permitting the siting of factory-built houses that comply with the BOCA/CABO Code and excluding those that instead comply with the HUD Code, Appellants are clearly violating this express prohibition.

Appellants claim that the District Court's finding that exclusion was predicated on non-compliance with the BOCA/CABO Codes is inconsistent with its finding that a jury could conclude that exclusion of mobile homes from the R–2 zones was motivated by aesthetic and tax considerations. As the District Court was careful to point out, however, preemption under the NMHCSSA turns not on motive but on the effective imposition of a construction or safety code differing from the federally-approved HUD Code. Here, the mechanism for distinguishing between permitted and forbidden uses turns on Code compliance. The resulting practice is statutorily-preempted, regardless of the motive for the underlying distinction. In other words, although the Township is free to exclude certain types of housing based on aesthetic and tax considerations, when it in practice *defines* what housing is deemed aesthetically dissimilar and economically undesirable *by the construction and safety codes to which such housing has been manufactured*, it runs afoul of the NMHCSSA.

Notwithstanding the parties' evident disagreement as to the purpose behind the appellants' attempted exclusion of HUD mobile homes, it appears there is no material issue of fact on how the exclusion was applied. Indeed, Appellant conceded at oral argument that it has used the HUD code compliance as a "short-hand" or proxy for its aesthetic and tax concerns. I believe this concession proves the correctness of Judge Diamond's analysis. The Act forbids local governments from using non-compliance with a competing code as a criterion, no matter what their motive in doing so may be.

As the District Court stated, "under both case law and HUD policy, a locality cannot exclude or restrict manufactured homes that meet the federal standards if the locality accepts manufactured homes meeting other differing standards." It was correct in concluding that because, as a matter of law, "the Township's zoning ordinance [was] being enforced to restrict homes from being sited in certain zoning districts based solely on the building code to which they were constructed," such application was preempted by the express provisions of the NMHCSSA.

For these reasons, and those given by the District Court, I would affirm.